IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SLAWOMIR P. WOZNIAK, *Petitioner*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent*

BALLET ARIZONA, *Respondent Employer*,

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,
*Respondent Carrier*.

No. 1 CA-IC 14-0022
FILED 9-24-2015

Special Action – Industrial Commission

ICA Claim No. 20131-480051
Carrier Claim No. 127-CB-ETY-0017J

The Honorable Rachel C. Morgan, Administrative Law Judge

**AWARD SET ASIDE**

COUNSEL

Crossman Law Office, P.C., Phoenix
By Harlan J. Crossman
*Counsel for Petitioner*

Industrial Commission of Arizona, Phoenix
By Andrew F. Wade
*Counsel for Respondent*

Klein, Doherty, Lundmark, Barberich & LaMont, P.C., Phoenix
By R. Todd Lundmark
*Counsel for Respondents Employer and Carrier*

---

**OPINION**

Judge Michael J. Brown delivered the Opinion of the Court, in which
Presiding Judge Peter B. Swann and Judge Kenton D. Jones joined.

---

**B R O W N**, Judge:

**¶1**	This is a special action review of an Industrial Commission of
Arizona ("ICA") award setting an average monthly wage. The question we
address is whether the administrative law judge ("ALJ") erroneously found
that employee Slawomir Wozniak's work as a ballet dancer was "seasonal"
and thus improperly relied on an expanded wage base when calculating
Wozniak's average monthly wage. Because we conclude the ALJ erred, we
set aside the award.

**BACKGROUND**

**¶2**	In March 2013, Wozniak injured his shoulder when lifting
another dancer while working for Ballet Arizona. Wozniak filed a workers'
compensation claim, which was accepted for benefits by the respondent
carrier, Travelers Property Casualty Company ("Travelers"). On June 20,
2013, the ICA entered its Notice of Average Monthly Wage setting
Wozniak's wage at $4,185.78.[1] Counsel for Travelers and Ballet Arizona
requested a hearing on the ICA's wage determination. At the subsequent

---

[1]	Previously, Travelers had issued two notices of claim status setting
forth its recommended average monthly wage calculations: May 7, 2013
($3080) and June 7, 2013 ($4,185.78). The ICA, which is tasked with
determining the employee's average monthly wage for the purpose of
establishing disability benefits, Arizona Revised Statutes ("A.R.S.") section
23-1061(F), adopted Travelers' second recommendation, which is the
statutory maximum under A.R.S. § 23-1041(E).

hearing, the ALJ heard testimony from Cathy Chatanawich, who handles payroll administration for Ballet Arizona, and Wozniak.

¶3        Wozniak's employment contract with Ballet Arizona for the 2012-2013 season consisted of 32 "non-consecutive weeks"[2] starting on August 13, 2012, and continuing at least through May 5, 2013. Wozniak was to be paid $770 per week during the contract term. Ballet Arizona retained an option to extend the term by up to four additional weeks for a total of 36 weeks, but could not extend the term beyond June 9, 2013. Wozniak was not permitted to obtain "any outside employment or work activity" without prior approval of Ballet Arizona, and was required to submit a certification of fitness for duty, completed by a health care provider, in the two months preceding the start of the 2012-2013 season. The contract also stated Ballet Arizona would provide a "comprehensive workers' compensation insurance program" but that such coverage would not apply to injuries resulting from outside employment.

¶4        Wozniak testified he had worked for Ballet Arizona as a dancer for five years at the time of his injury. Responding to a question from his counsel as to whether he could "go out and find a job any place" he wanted to during the summer, Wozniak stated, "No. No companies are working that. . . [,]" at which point his counsel interrupted, stating, "Okay. Thank you." Wozniak explained, however, that beginning in September 2012, he also worked as a teacher at a local ballet school, owned by his father, at a salary of $1000 per month.

¶5        Chatanawich testified that dancers at Ballet Arizona generally work from August to May, with a typical season lasting 36 weeks. She stated that Ballet Arizona had paid Wozniak $3080 in the 30-day period leading up to his injury and his compensation for the one-year period before his injury (spanning two contracts) was $28,494.

¶6        The ALJ entered an award setting Wozniak's average monthly wage at $3310. In reaching that figure, the ALJ adopted Travelers' analysis in its post-hearing memorandum, which advocated treating Wozniak as a seasonal employee and therefore divided Wozniak's one-year earnings from Ballet Arizona of $27,720 by twelve, for an average monthly wage of $2310, instead of the amount actually earned by Wozniak for the

---

[2]        Chatanawich explained that "non-consecutive weeks" means the artists do not dance for 32 continuous weeks. Instead, they often have time off between productions and these weeks do not count towards the 32-week contract term.

thirty-day period before his injury. Travelers did not contest that Wozniak was earning $1000 per month from the ballet school. Wozniak requested administrative review, and the ALJ supplemented and affirmed the Award. Wozniak then sought appellate review.

## DISCUSSION

¶7        In reviewing findings and awards of the ICA, we defer to the ALJ's factual findings but review questions of law de novo. *Young v. Indus. Comm'n*, 204 Ariz. 267, 270, ¶ 14 (App. 2003). We consider the evidence in a light most favorable to upholding the ALJ's award. *Lovitch v. Indus. Comm'n*, 202 Ariz. 102, 105, ¶ 16 (App. 2002).

### A.        Average Monthly Wage Presumption

¶8        Neither party disputes that the ALJ properly included the $1000 per month Wozniak earned teaching ballet. *See Wiley v. Indus. Comm'n*, 174 Ariz. 94, 104 (1993) (when calculating an injured worker's average monthly wage, earnings from simultaneous concurrent employments are typically aggregated to establish a claimant's average monthly wage). Thus, the primary issue before us is whether the ALJ erred in calculating Wozniak's average monthly wage as a ballet dancer by using an expanded wage base (twelve months) instead of a thirty-day presumptive average monthly wage.

¶9        The essence of any workers' compensation system is the concept of shared risk; the risk of injury should be allocated as evenly as possible between employee and employer and in proportion to the wages and premiums actually paid. *Id.* at 101 ("[F]airness to the employee and fairness to the employer or carrier are not opposite sides of the same coin."). The primary purpose of the Arizona Workers' Compensation Act, A.R.S. §§ 23–901 to 23–1091 ("the Act") is "to compensate an employee for wages he would have earned without his injury and, thereby, prevent him from becoming a public charge during his disability." *Lowry v. Indus. Comm'n*, 195 Ariz. 398, 400, ¶ 6 (1999). Because "[t]he goal of the Act is to determine a realistic pre-injury wage base which can serve as a standard of comparison with the post-injury earning capacity of the injured worker[,] the emphasis in setting a worker's average monthly wage is on what the employee *has actually earned* for his labors." *Id.* (emphasis in original) (internal quotation omitted). "The wage base should realistically reflect a claimant's actual monthly earning capacity." *Id.*

¶10        Determining a claimant's average monthly wage is governed by A.R.S. § 23-1041, which provides in pertinent part:

A.      Every employee of an employer within the provisions of this chapter who is injured by accident arising out of and in the course of employment . . . *shall receive the compensation fixed in this chapter on the basis of the employee's average monthly wage at the time of injury.*

B.      If the injured or killed employee has not been continuously employed for the period of thirty days immediately preceding the injury or death, the average monthly wage shall be such amount as, having regard to the previous wage of the injured employee or of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, reasonably represents the monthly earning capacity of the injured employee in the employment in which the injured employee is working at the time of the accident.

C.      If the employee is working under a contract by which the employee is guaranteed an amount per diem or per month, notwithstanding the contract price for such labor, the employee . . . shall be entitled to receive compensation on the basis only of the guaranteed wage as set out in the contract of employment [.]

. . . .

G.      For the purposes of this section, "monthly wage" means the average wage paid during and over the month in which the employee is killed or injured.

(Emphasis added.)  To achieve the objective of compensating employees on the basis of wages actually earned, subsection A establishes a presumptive thirty-day wage period.  *Kennecott Copper Corp. v. Indus. Comm'n*, 61 Ariz. 382, 385 (1944) ("[I]f the employee, at the time of his injury or death, has been employed for thirty or more days, his normal and over-time wage for the previous thirty days shall be the basic wage for computing compensation[.]"); *Elco Veterinary Supply v. Indus. Comm'n*, 137 Ariz. 46, 47-48 (App. 1983), *approved*, 137 Ariz. 45 (1983) ("[T]he wages earned during the 30 days preceding the injury are the presumptive average monthly wage[.]").

¶11      If the presumptive period does not realistically reflect a claimant's earning capacity, an ALJ has discretion to apply an expanded

wage base. *Lowry*, 195 Ariz. at 401, ¶ 10; *see also Floyd Hartshorn Plastering Co. v. Indus. Comm'n (Floyd I)*, 16 Ariz. App. 498, 505 (1972) ("[I]f the evidence shows that for some reason said wages do not realistically reflect the claimant's demonstrated earning capacity, then the [ALJ] should consider wages received over such a reasonable period in excess of thirty days as would allow the consideration of pertinent factors."). However, the ALJ's discretion to set a realistic wage base is limited; "the evidence [introduced at the hearing] must justify using a wage base greater than one month." *Davis v. Indus.Comm'n*, 134 Ariz. 293, 296 (App. 1982); *see also Floyd Hartshorn Plastering Co. v. Indus. Comm'n (Floyd II)*, 22 Ariz. App. 603, 605 (1974) (explaining that while the ALJ "must be given the discretion to choose a period of time which he feels leads to a just result," he or she "may not arbitrarily choose a period of time in calculating average monthly wage so as to improperly reflect claimant's average monthly earnings"). Justifications for using an expanded wage base include intermittent employment, seasonal employment, or temporarily inflated wages. *Lowry*, 195 Ariz. at 401, ¶ 10.

## B. Seasonal Employment

**¶12** Based on Chatanawich's testimony that Wozniak earned $3080 from his work with Ballet Arizona during the thirty days immediately prior to his injury, his presumptive average minimum wage is:

$3080 + $1000 (monthly wages for teaching ballet) = $4080.

Wozniak argues the ALJ erred in setting his average monthly wage at less than this presumptive amount. Travelers counters that the ALJ acted within her discretion in deviating from the presumptive thirty-day calculation because Wozniak is a seasonal employee, based on the ballet season, which roughly runs from August to May. Travelers argues the ALJ correctly applied the formula for calculating the average monthly wage of seasonal employees by dividing Wozniak's total yearly earnings by twelve months as follows:

$770 per week x 36 weeks (maximum number of weeks in Ballet Arizona season) = $27,720

$27,720 ÷ 12 months = $2310

$2310 + $1000 = $3310

¶13        "Seasonal employment refers to occupations which can be carried on only at certain seasons or fairly definite portions of the year. It does not include such occupations as may be carried on throughout the entire year." *Pettis v. Indus. Comm'n*, 91 Ariz. 298, 302 (1962); *see also* Black's Law Dictionary (10th ed. 2014) (defining "seasonal employment" as "an occupation possible only during limited parts of the year, such as a summer-camp counselor, a baseball-park vendor, or a shopping mall Santa" and "seasonal employee" as "an employee who is engaged to work for only a certain time of the year when a business anticipates a cyclical increase in demand").[3] An employee who does not work for a portion of

---

[3]      The *Pettis* court cited *Hiestand v. Ristau*, 284 N.W. 756 (Neb. 1939), which in turn relied on a prior Nebraska case that included a detailed explanation of "seasonal employment" in the context of workers' compensation law:

> Many words and phrases used in the Workmen's Compensation Law are therein given a statutory definition. "Seasonal" and "seasonal employment" are not so defined. They must be deemed to have been used in the sense that they are commonly and popularly understood. The word "seasonal" pertains, of course, to the four seasons of the year—spring, summer, autumn and winter—but is popularly used in a somewhat wider sense. We speak of the planting season, the harvesting season, hop-picking season, peach and apple-picking season, the berry-picking season, and many other like expressions. All of these have reference to a particular and somewhat definite period of the year. Natural ice harvesting can only be carried on in the colder months. Berry-picking must be carried on when the berries are ripe and ready for market; so with peaches, apples and other fruit crops. The planting season is usually in the spring months; the harvesting season in the summer months; and we think it is in this sense that the term was used. Shoveling and delivery of coal are not confined to any season of the year but are carried on throughout the year.
>
> . . . .
>
> We think the term "seasonal employment," as used in the Compensation Law, has reference to an employment which

the year is not a seasonal worker if the employee is willing to work and his failure to work is attributable to the employer's decisions.  *See Pettis*, 91 Ariz. at 302; *see also Miller v. Indus. Comm'n*, 113 Ariz. 52, 54 (1976) ("The test is whether the *employment* not the worker is intermittent or erratic.").

**¶14**        In *Pettis*, the claimant argued the ICA's decision to compute his average monthly wage by dividing his total yearly earnings by twelve months failed to account for the two months of the year he did not cut timber due to a shutdown by his employer.  91 Ariz. at 300.  Evidence showed that weather conditions in Arizona permitted timber cutting year-round and the claimant testified "he could have worked had his employer worked."  *Id.* at 302.  The *Pettis* court explained that an expanded wage base of twelve months could be a proper method of calculating the average monthly wage of a seasonal employee, but held the claimant was not a seasonal employee because his two-month loss of work was due to an "employer shutdown" over which he had no control.  *Id.* at 303.

**¶15**        In *Powell v. Industrial Commission (Powell I)*, 7 Ariz. App. 518, 520 (1968), the ICA determined that a teacher working pursuant to a nine-month contract of employment should be awarded workers' compensation as if she were a seasonal employee because she did not work from June through August.  The ICA therefore calculated the teacher's average monthly wage by dividing her annual salary by twelve.  *Id.*  This court disagreed with the calculation, holding that the teacher's employment "was a matter of contract," "not seasonal[,]" and her average monthly wage should be set at the total of her two bimonthly paychecks.  *Id.* at 522.  The supreme court affirmed, also holding that the teacher was not a seasonal worker and analogizing her nine-month contract to the "employer shutdown" in *Pettis*.  *Powell v. Indus. Comm'n (Powell II)*, 104 Ariz. 257, 263 (1969).  Applying the reasoning in *Pettis*, the supreme court concluded there was school work in the summer months, but the teacher's particular school did not employ teachers during the summer and did not offer full-year contracts; thus, it would be unfair to include in the average monthly wage calculation "a period of time not covered in the contract by calling it seasonal employment."  *Id.* at 263; *see also Stanton v. Indus. Comm'n*, 116 Ariz. 1, 3 (1977) (holding an ALJ erred in calculating an award based on seasonal employment when claimant, a high school student, was hired to work only

---

must have been completed during some rather definite period of the year.

*Hogsett v. Cinek Coal & Feed Co.*, 255 N.W. 546, 547 (Neb. 1934).

for three months during the summer and his "job duties were performed at other times than in the summer months by other regular employees").[4]

¶16   As in *Pettis* and *Powell*, the duration of Wozniak's employment was determined exclusively by Ballet Arizona and not by Wozniak's own employment preferences or by climate-related restrictions limiting ballet performances to a specific period less than year-round. Wozniak's employment was based on Ballet Arizona's anticipated performance schedule for the 2012-2013 season, and set out in Wozniak's employment contract, which he signed at least two months before the season began. Even after Wozniak and Ballet Arizona entered into the contract, Ballet Arizona retained further control over the contract term, reserving for itself the "option" to extend the season and providing for a maximum term of ten calendar months.

¶17   Although the ALJ found that Wozniak "testified he cannot find work in the summer any place he wanted to because companies were not working[,]" the hearing transcript shows Wozniak began to answer "No companies are working that . . ." before he was interrupted by counsel. Travelers presented no evidence indicating employment as a ballet dancer or similar work was unavailable to Wozniak during the summer months. *Compare Powell I*, 7 Ariz. App. at 521 (holding that employment is not

---

4   Travelers has not cited, nor has our research revealed, any reported decision affirming an ICA award that deviated from the § 23-1041(A) presumptive thirty-day wage period by applying the seasonal employment exception. There is at least one reported Arizona decision affirming the ICA's application of the seasonal employment exception, but that occurred in the context of calculating an award pursuant to § 23-1041(B). *See Baker v. Indus. Comm'n*, 119 Ariz. 102, 104 (App. 1978) (affirming an award to a claimant injured on his *fourth* day of employment as a cotton picker and finding "[i]t is undisputed that cotton picking cannot be carried on throughout the year" and that the 69-year-old claimant had specifically testified he intended to limit his employment to the cotton harvest so he would not lose his Social Security benefits). *But see Miller*, 113 Ariz. at 54 (holding that the earning capacity of a college student injured during the first thirty days of his summer employment "is not to be determined by whether he intended to work steadily in the industry in which he is employed" and that "[a]ny division by twelve months of an earning base established by three months of wages finds no support whatsoever in the statute").

seasonal when evidence established the petitioner is "free to teach during the portion of the year not expressly covered by contract") *with Baker*, 119 Ariz. at 103-04 (holding that a cotton picker was a seasonal employee because "cotton picking cannot be carried on throughout the year" but noting that the court might "face a different question if petitioner had been consistently employed throughout the year . . . going from one type of crop harvest to the next"). Nor did Travelers present evidence showing that ballet dancing (or similar work) can only be performed during certain times of the year or that Ballet Arizona was constrained in its designation of Wozniak's contract term by weather, climate, or other attributes of seasonality. *See Pettis*, 91 Ariz. at 302.

¶18 Instead, the evidence presented supports the conclusion that Wozniak's employment was not seasonal. In June 2012, immediately upon termination of his 2011-2012 contract, Wozniak signed a new contract with Ballet Arizona for an employment term of up to ten calendar months beginning in August 2012. Under the contract, Wozniak was required to obtain a "certification of fitness for duty" two months before the start of the 2012-2013 season and to appear at marketing and media events outside work hours. He could not, however, acquire additional outside employment, as a ballet dancer or otherwise, without the consent of Ballet Arizona or its artistic director. Thus, although Ballet Arizona's performance schedule spanned a period of less than one year, as a practical matter Wozniak was contractually bound to perform certain obligations for Ballet Arizona throughout the year. Given the nature of Wozniak's employment arrangement with Ballet Arizona, and without any evidence that unavailability of work during the summer months is a "common and ordinary incident of employment" in the ballet industry, the ALJ erred in finding Wozniak's employment with Ballet Arizona was seasonal.

## C. Applicability of A.R.S. § 23-1041(C)

¶19 Citing A.R.S. § 23-1041(C), which provides that an employee working under a contract involving a guaranteed wage is entitled to compensation based on that amount, Wozniak further argues that his average monthly wage from Ballet Arizona should be higher than $3080, the amount he earned in the thirty-day period prior to his injury. He asserts the average monthly wage should be $3,336.41, calculated by multiplying $770 (his contracted weekly wage) times 4.333 (the number of weeks in a month).

¶20 Interpreting an earlier version of § 23-1041,[5] the supreme court found "[i]f, as a matter of fact, the evidence showed that petitioner had been guaranteed by the terms of his employment a minimum number of hours per week, we think this sentence of the section would have applied and that his compensation should have been calculated on that basis." *Brisendine v. Skousen Bros.*, 48 Ariz. 416, 424 (1936). Our supreme court in *Powell II* likewise concluded that because "it would be inequitable for the school district to have to pay premiums on [a] 3-month period for which no [work-related] accident could occur," it would likewise be inequitable to set the teacher's average monthly wage based on a full year when she was contracted to work only nine months. 104 Ariz. at 263. Without expressly relying on A.R.S. § 23-1041(C), the supreme court held that the teacher's average monthly wage "was covered by the contract under which she was employed" and "should be fixed by dividing the amount of the contract by the period of employment." *Id.; see also Powell I*, 7 Ariz. App. at 522 ("We hold that the petitioner's employment was a matter of contract[.]").

¶21 Section 23-1041(C) provides that if an employee is working pursuant to an employment contract that guarantees a wage, the employee "shall be entitled to receive compensation on the basis only of the guaranteed wage" set forth in the contract. Assuming, without deciding, that A.R.S. § 23-1041(C) requires an ALJ to set the average monthly wage at the amount guaranteed by an employment contract, Wozniak was not guaranteed a specific wage under the terms of his contract with Ballet Arizona. Unlike the teacher in *Powell*, who was paid $455.23 every two

---

[5] That version of the statute provided:

> If the employee was working under a contract with his employer under the terms of which the employee was guaranteed an amount per diem or per month, notwithstanding the contract price for such labor, then said employee . . . *shall be entitled to receive the compensation on the basis only of the guaranteed wage as set out in said contract of employment*, whether such amount was paid on a per diem basis or on a monthly basis, provided that in no event shall such basis be less than the wages paid to employees for similar work not under contract.

1933 Ariz. Sess. Laws, 1st S.S., ch. 11, § 6 (emphasis added).

weeks for nine months, *Powell I*, 7 Ariz. App. at 522, Wozniak contracted to work as a ballet dancer for up to 36 *non-consecutive* weeks. He was paid $770 for each week he worked, but if he did not work, he was not paid. Thus, depending on Ballet Arizona's performance schedule, Wozniak may have earned $3080 in a particular month, as he did in the 30 days preceding his injury, but he also could have earned as little as $1540 in a month, given Chatawanich's testimony that it was typical for Ballet Arizona to take a two-week break in early January.

¶22 Moreover, Wozniak was not guaranteed to earn a set salary for the entire year. *Cf. Powell I*, 7 Ariz. App. at 520 ("The petitioner's salary was specified in the sum of $9,039.50."). Instead, Ballet Arizona expressly reserved the "option" to extend the stated 32-week term by an additional four weeks. Wozniak could have made as little as $24,640 or as much as $27,720, depending on whether Ballet Arizona decided to exercise its option to extend the contract.[6] Given the variability of Wozniak's employment contract with Ballet Arizona, he did not receive a guaranteed wage under the contract. Thus, the best approximation of Wozniak's earning capacity at the time of his injury is his actual earnings in the 30-day period prior to his injury. *See Lowry*, 195 Ariz. at 401, ¶ 11 (explaining that the 30-day presumption "emphasizes reliance upon actual wages [the employee] has already earned to create the wage base that most accurately reflects his true average monthly wage" and involves "no extrapolation or speculation about unearned wages").

## CONCLUSION

¶23 We hold that the ALJ erred in calculating Wozniak's average monthly wage as if he were a seasonal employee. The award is therefore set aside.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama

---

[6] No evidence regarding the actual schedule for the 2012-2013 Ballet Arizona season was presented at the hearing.